DIERSEN (Hildegard), Plaintiff and Respondent, vs. STAVEN, Defendant: DIERSEN (Harry) and another, Defendants and Appellants.

*December 6, 1955—January 10, 1956.*

520

521

For the appellants there was a brief by *Hannan, Johnson & Goldschmidt,* attorneys, and *Herbert L. Wible* of counsel, all of Milwaukee, and oral argument by *Mr. Wible.*

For the respondent there was a brief and oral argument by *Ray P. Wherry* of Milwaukee.

CURRIE, J. Question No. 5 of the special verdict, which inquired as to whether Harry Diersen was negligent so as to increase the danger which the plaintiff Hildegard Diersen assumed when she entered the car so as to create a new danger, should have been limited solely to management and control and should not have contained the subdivisions (A) and (B) relating to lookout and speed. This is because the host-driver owes the same degree of care to his guests with respect to the elements of lookout and speed as he owes to other persons using the highway. *Ameche v. Ameche* (1955),

ante, pp. 170, 174, 72 N. W. (2d) 744; and *Poneitowcki v. Harres* (1930), 200 Wis. 504, 511, 228 N. W. 126, 129. Question No. 3 of the special verdict was correctly framed to cover the issue of possible negligent lookout and speed on the part of the defendant Harry Diersen with respect to all parties in the two actions, including Mrs. Diersen as a guest in his automobile. As explained in these two cited cases, the driver of an automobile who maintains excessive or reckless speed, or fails to maintain a proper lookout, *"plainly increases the dangers which the guest assumed upon entering the automobile and adds new ones, and there manifestly is no difference between the degree of care he is required to use in these respects for the safety of his guests and for the safety of other persons."*

The learned trial court justified his change of the answers in the special verdict on the ground that Harry Diersen was causally negligent as to lookout as a matter of law, and further that, as a matter of law, a guest, such as Mrs. Diersen, does not assume the risk to the host incident to the latter's momentary failure to maintain a proper lookout. The sole issue on this appeal is whether the evidence requires such a determination.

The collision occurred between a 1947 Ford sedan automobile owned and operated by the defendant Diersen and a 1950 Buick car owned and driven by the defendant Staven. Such accident happened at about 8:45 p. m. on the evening of February 4, 1951, at the right-angle intersection of Oklahoma avenue and South 84th street in the town of Greenfield, Milwaukee county. The Diersen car had entered Oklahoma avenue from U. S. Highway 100, some considerable distance to the west of the point of collision, and was proceeding easterly at the time the accident occurred, while Staven was driving his car in a southerly direction on South 84th street.

Oklahoma avenue was an arterial highway and an official arterial stop sign was located near the northwest limits of the intersection, but Staven had proceeded into the intersection without stopping for such sign. The speed of each vehicle was approximately 40 miles per hour as it entered the intersection.

The following questions and answers appearing in Diersen's testimony are significant on the issue of lookout:

"*Q.* Now, when did you first see the Staven car? *A.* The Staven car I saw momentarily or simultaneously with the impact.

"*Q.* You did not see the car then until immediately before the impact? *A.* It might have been just a second.

"*Q.* A split second? *A.* It was so fast I didn't take my foot off the throttle.

"*Q.* Did you see the lights of the Staven car? *A.* I wouldn't say I saw lights. I saw sort of a fast-moving object.

"*Q.* And where with relation to the center of that intersection did you see this fast-moving object? *A.* That was just directly in front of my vision, the steering wheel on the left side, it was straight ahead of me or to the corner there. That is where I saw this thing, and it was all over. . . .

"*Q.* Did you see any lights on that automobile that night? *A.* No, sir."

The paved portion of Oklahoma avenue was approximately 30 feet wide with three traffic lanes. The Diersen car was operated in the south or right-hand traffic lane, and the collision occurred, according to Diersen's testimony, in such south traffic lane of Oklahoma avenue a little to the west of the east and west center line of the intersection, and it was the front portions of the two vehicles which struck each other.

One Robert Miller was driving his own automobile westerly on Oklahoma avenue and was approximately 50 to 75 feet east of the intersection at the time the collision took place. Miller first saw the Staven car when it was a few

hundred feet north of the intersection and was able to see it fairly well from that time until the time of the collision. Miller's own speed was approximately 20 to 25 miles per hour. Miller observed that the speed of the Staven car was such that it was not going to be able to stop for the arterial stop sign and exclaimed to his passenger Mlinar, "Look, there is going to be an accident." Mlinar, the passenger in the Miller car, testified that he first saw the Staven car when the Miller automobile was approximately 200 feet east of South 84th street, and that he also saw the lights of the Diersen car approaching from the west.

If this were all the material testimony on this question of lookout, Diersen would be causally negligent as to lookout as a matter of law under our decision rendered at this same assignment in *Oelke v. Earle* (1956), ante, p. 479, 74 N. W. (2d) 336. Counsel for the appellant defendants seek to distinguish the instant case from those cases cited by us in the *Oelke Case* on the ground that the Staven car was not visible to Diersen until he entered the intersection, and, therefore, the jury had the right to find that Diersen's failure of negligent lookout was not causal because he could not have seen the Staven car in time to have taken any effective steps to avoid the collision. Counsel base this contention upon the alleged presence of snowbanks along the sides of both highways near the intersection and claim that vision was further obscured by reason of there being a dip in Oklahoma avenue west of the intersection and another one in South 84th street north of the intersection.

The testimony in the record does not substantiate the contention that high snowbanks obstructed Diersen's vision to the left as he approached the intersection. Diersen testified: There were banks of snow piled along Oklahoma avenue that night and that their height varied; "sometimes" such banks were five feet high and "sometimes" six feet high; but that there may not have been any snow along Oklahoma avenue

eastward from the point, where he passed two cars just east of Beloit road on Oklahoma avenue, because the latter street was there constructed on filled ground. When asked how high the snowbanks were on South 84th street he stated that he did not know how high they were on the date of the accident. Disinterested witnesses testified that the snowbanks on the east side of South 84th street were only two feet high but that such banks were "some higher" on the west side of such street. Mrs. Diersen testified that the snowbanks along Oklahoma avenue were four feet high but she did not know how high they were along South 84th street. Oklahoma avenue sloped downward from west to east and South 84th street inclined to the south as these two streets approached the intersection.

Nowhere in his testimony did Diersen directly testify that his view to the left toward the approaching Staven car was obstructed on the night of the accident. On the one occasion when he was asked whether his view to the left as he approached the intersection was obstructed, he answered, "I don't know what it should be caused by." Surely, he would not have so answered if he had considered that the snowbanks were high enough to obstruct his view of possible traffic proceeding southward on South 84th street. As the learned trial judge pointed out in his memorandum decision, the disinterested witnesses Miller and Mlinar had no difficulty, as they approached the intersection from the east, in seeing from their car the Staven automobile when it was several hundred feet north of the intersection, and Diersen should have been able to do likewise. Furthermore, the place of collision was an unlighted country intersection, and, even if the Staven car as it approached the same had been partly obscured by snowbanks, its headlights would have been plainly visible to cars approaching from the west on Oklahoma avenue.

The contention that there was a dip in each highway which might have obscured Diersen's vision is also wholly un-

supported by the evidence. As to the dip in Oklahoma avenue, its location is fixed no more definitely in the evidence than that it was somewhere between the crossing of Oklahoma avenue by Beloit road and the intersection of Oklahoma avenue with South 84th street, a distance of some five or six blocks. Such dip must have been more than 300 feet west of the intersection because Diersen testified that he had a clear view of such intersection for 300 feet. It cannot have been very deep because Diersen also testified that, as a result of a test he made afterward, when he was in the dip his eye level was in line with the top surface of the intersection. Not only was the Staven car considerably higher than the surface of the intersection but when approaching on South 84th street it was on an incline which sloped toward the intersection.

The location of the alleged dip in South 84th street with respect to its distance from the intersection is in no manner fixed in the evidence. Diersen testified that from a test made by him some days after the accident he determined it would have been impossible to have seen a vehicle in the dip on South 84th street from a car located in the dip on Oklahoma avenue. Without locating the distance of each dip from the intersection such testimony is valueless. Miller testified that, when he watched the Staven car approach the intersection while it traversed a distance of 200 feet, he saw the top half of such car and its lights. When asked on cross-examination whether he lost sight of the Staven car "as it went down through that dip with those snowbanks on top of the ground," he answered, "I might have. I don't know if I watched it all the way right straight down." There is not a scintilla of evidence that the illumination from the lights of the Staven car would not have at all times been visible to Diersen if he had looked to his left at any time during the last 300 feet before entering the intersection. Furthermore, according to the undisputed testimony of Miller and Mlinar the Staven car itself, including its lights, were in plain view to

traffic approaching the intersection on Oklahoma avenue for most of such distance.

We have no hesitancy in concluding that if Diersen had made a proper observation to his left as he approached the intersection, at a time which would have permitted him to have taken effective steps to avoid a collision, he would have observed either the Staven car itself or its lights and that such car was traveling at a speed which would not have enabled it to stop for the arterial stop sign. Miller and Mlinar made such observation and there is no reason why Diersen should not have done likewise. It follows that Diersen's negligence as to lookout contributed to cause the collision, and, therefore, is causal as a matter of law. *Oelke v. Earle, supra,* and other Wisconsin cases therein cited.

Counsel for the appellants contend that the issue of whether Mrs. Diersen assumed the risk of her husband's negligent lookout presented a question of fact which the jury had resolved in appellants' favor. The general rule is that a guest does not assume the risk incident to a host's momentary failure to maintain a proper lookout. *Whirry v. Rural Mut. Casualty Ins. Co.* (1954), 267 Wis. 302, 308, 64 N. W. (2d) 841. However, appellants' counsel seek to bring the instant case within the exception to such rule enunciated by this court in *Haugen v. Wittkopf* (1943), 242 Wis. 276, 7 N. W. (2d) 886; and *Shrofe v. Rural Mut. Casualty Ins. Co.* (1950), 258 Wis. 128, 45 N. W. (2d) 76.

In *Haugen v. Wittkopf, supra,* the accident occurred in February when the weather was cold. When the host and guest entered the car the windshield as well as the windows were heavily frosted and remained so up to the time of the accident, and although the defroster had been operating it had only cleared a semicircular place at the bottom of the windshield about four or five inches high so that it was necessary for the host-driver to "duck" his head down to see through the cleared space. This court held that the guest

had assumed the host's negligence as to lookout as a matter of law under such fact situation.

The facts in *Shrofe v. Rural Mut. Casualty Ins. Co., supra,* were similar in nature. The accident happened in December and the host car was not equipped with a defroster and had but one windshield wiper, which worked imperfectly. Part of the time the windshield was obscured by snow on it, and at the time of the accident it was wet "with a kind of fog." The host-driver had lowered the window on his side and had been looking out of such window prior to the accident in order to operate the car but had pulled his head back into the car when about 200 feet from the point of impact. The accident occurred as a result of the host car running into the rear of a parked automobile. This court, following the precedent of *Haugen v. Wittkopf, supra,* held that the guest had assumed the risk of the host's negligent lookout.

In the instant case the Diersen automobile had been operated for a distance of approximately 35 miles prior to the accident and was occupied by Mr. and Mrs. Diersen and their three small children. The temperature was 10 degrees above zero but the car was equipped with a defroster which worked perfectly and both Mr. and Mrs. Diersen testified as to the windshield being clear. In fact, Diersen stated that he had "perfect vision." There was some steaming up of the side windows. However, Diersen's range of vision through the clear windshield was sufficient to have enabled him to have seen the Staven car or its lights approaching from the north a sufficient distance west of the intersection to have taken timely steps to have avoided the collision. It would not be necessary for Diersen to look through the left front window of his car to have seen the approaching Staven car or its lights until the Diersen car was practically in the intersection. Diersen made no claim that his failure to have seen the approaching Staven car sooner than he did was due to any steaming up of the left front window.

It is the clear windshield in the instant case which distinguishes its facts from those of *Haugen v. Wittkopf, supra;* and *Shrofe v. Rural Mut. Casualty Ins. Co., supra.* We, therefore, conclude that the learned trial court was right in applying the general rule of *Whirry v. Rural Mut. Casualty Ins. Co., supra,* to determine that Mrs. Diersen did not assume the risk of the momentary lapse of her husband in keeping a proper lookout.

*By the Court.*—Judgment affirmed.